[Nos. 41486-1-I; 41488-7-I; Division One. June 21, 1999.]
41638-3-I; 41942-1-I;
41774-6-I; 41695-2-I;
41633-2-I; 42055-1-I;
42253-7-I; 41766-5-I;
41875-1-I; 41991-9-I.

THE STATE OF WASHINGTON, *Respondent*, v. J.H.,
*Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. Z.B.,
*Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. E.S.,
*Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. D.S.,
*Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. T.M.,
*Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. R.G.,
*Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. A.W.,
*Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. D.S.,
*Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. J.A.,
*Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. G.K.,
*Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. C.M.,
*Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. L.F.,
*Appellant*.

*David B. Koch, Eric J. Nielsen* and *James R. Dixon* of *Nielsen, Broman & Associates, P.L.L.C.*; *Catherine L. Floit*; *Sheryl G. McCloud*; *Susan J. Craighead* of *Public Defenders Association*; and *Elise N. Gautama* of *Washington Appellate Project*, for appellants.

*Norm Maleng, Prosecuting Attorney*, and *Brian M. McDonald* and *Cheryl L. Snow, Deputies*, for respondent.

*Mark T. Fordham* and *Brian C. O'Brien*, amicus curiae.

ELLINGTON, J. — In this consolidated appeal, we consider whether the 1997 amendments to the juvenile justice code have made juvenile proceedings so similar to adult criminal proceedings that juvenile offenders are now entitled to a jury trial under either the United States or Washington constitution. Applying Washington case precedent, we find that the amendments do not render juvenile proceedings so much less rehabilitative and more punitive that the right to a jury trial must attach. Some of the juveniles raise additional arguments based on the facts of their particular cases. We find no reversible error with respect to these issues. Accordingly, we affirm in each of the cases

## I. Sixth and Fourteenth Amendments

The federal constitution guarantees an adult criminal defendant the right to an impartial jury in all criminal prosecutions.[1] The Washington constitution contains the same guarantee.[2] Juvenile offender cases, however, are tried without a jury under RCW 13.04.021(2). Because of the differences between the juvenile justice system and the adult criminal system, the denial of a jury trial to juveniles has been repeatedly held constitutional.

In *McKeiver v. Pennsylvania*, the United States Supreme Court held that "trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement."[3] The plurality in *McKeiver* also noted the possibility that a jury trial might "remake the juvenile proceeding into a fully adversary process and will put an effective end to

---

[1] U.S. CONST. amends. VI, XIV.

[2] WASH. CONST. art. I, §§ 21, 22.

[3] 403 U.S. 528, 545, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971).

what has been the idealistic prospect of an intimate, informal protective proceeding."[4] In *Estes v. Hopp*, our state court reached the same conclusion.[5] After enactment of the Juvenile Justice Act of 1977 (JJA), our Supreme Court again held in *State v. Lawley* there is not a constitutional right to a jury trial under our statutes.[6] The *Lawley* court rejected the argument that the JJA represented a shift in focus from rehabilitation to punishment such that juvenile proceedings were so akin to adult criminal prosecutions that a right to jury trial arose. Later, considering amendments to the JJA that increased the emphasis on punishment, our court again addressed the question in 1987, and held in *State v. Schaaf* that despite the amendments, juvenile proceedings remained rehabilitative in nature and distinguishable from adult criminal prosecutions, and that the amendments created no right to trial by jury.[7]

After *Schaaf* was decided, the JJA was again amended to allow a juvenile offender who is determined to be a continuing and serious threat to the safety of others in the institution to be transferred from a juvenile detention facility to the department of corrections.[8] In *Monroe v. Soliz,* the court held that the possibility of such a transfer does not transform the juvenile's adjudication into an adult criminal conviction to which the right to trial by jury attaches.[9] The court noted that the differences between the adult criminal system and the juvenile justice system have led the court "to consistently conclude the right to a jury trial does not extend to juveniles adjudicated in juvenile proceedings." The court emphasized that a criminal conviction carries far more serious ramifications than a juvenile adjudication,

[4]*Id.*

[5]73 Wn.2d 263, 268, 438 P.2d 205 (1968).

[6]91 Wn.2d 654, 655, 591 P.2d 772 (1979).

[7]109 Wn.2d 1, 4, 743 P.2d 240 (1987).

[8]RCW 13.40.280.

[9]132 Wn.2d 414, 420, 939 P.2d 205 (1997).

regardless of where the juvenile serves his or her time, and, applying the reasoning in *Schaaf,* concluded the amendment did not create a right to a jury trial.[10]

The distinctions between the adult and juvenile systems that have been found to have constitutional consequence on this question lie in the rehabilitative purposes and lesser penalties of the Juvenile Justice Act, which stand in contrast to the punitive purpose and much more serious penalties of the adult criminal system. Our Supreme Court described the dichotomy thusly:

> The purpose of the juvenile justice system is ostensibly to establish a system having primary responsibility for, and responding to, the needs of offenders, as well as to hold juveniles responsible for their offenses. *The critical distinction between the two systems lies in the Juvenile Justice Act of 1977's (JJA) policy of responding to the needs of juvenile offenders. We have in the past found such a policy as rehabilitative in nature, whereas the criminal system is punitive. Such differences have led us to consistently conclude the right to a jury trial does not extend to juveniles adjudicated in juvenile proceedings.*[11]

## II. 1997 Amendments to Juvenile Justice Act

### A. Purpose and Intent

▮ We first note that the legislature's statement of intent and purpose[12] changed with enactment of the 1997 amendments only insofar as it increased the emphasis on responding to the needs of juvenile offenders.[13] The legislative intent underlying the juvenile justice system remains the establishment of "a system capable of having primary responsibility for, being accountable for, and responding to the needs of youthful offenders."[14] The JJA is also intended to hold youthful offenders accountable for their offenses,

---

[10]*Id.*

[11]*Id.* at 419-20 (emphasis added) (citations omitted).

[12]*See* RCW 13.40.010.

[13]*See* RCW 13.40.010(2)(k).

[14]RCW 13.40.010(2).

and to require that "communities, families, and the juvenile courts carry out their functions consistent with this intent."[15] To effectuate these policies, the legislature enumerated 11 purposes of the JJA and declared them to be of equal importance:[16] (1) to protect citizens from criminal behavior; (2) to provide a means to determine whether a juvenile has committed offenses as defined in the JJA; (3) to make the juvenile offender responsible for his or her behavior; (4) to provide for punishment commensurate with the age, crime, and criminal history of the juvenile; (5) to provide due process for juveniles alleged to have committed an offense; (6) to provide treatment, supervision, and custody of juvenile offenders; (7) to provide, where consistent with public safety, for the handling of juvenile offenders by communities; (8) to provide for restitution to crime victims; (9) to develop standards and goals for the operation, funding, and evaluation of the juvenile justice system; (10) to provide a policy to determine what types of offenders will receive punishment, treatment, or both; and (11) to encourage the juvenile's parents, guardian, or custodian to actively participate in the juvenile justice process. The eleventh purpose was added in 1997, and emphasizes the focus on the needs of the juvenile offender. The legislative statement of purpose was otherwise unchanged.[17]

This statement differs markedly from the legislature's statement of purpose in enacting the Sentencing Reform Act of 1981 (SRA), applicable to adult criminal proceedings. The SRA focuses primarily on punishment, not rehabilitation; only one of six purposes addresses rehabilitation.[18] The fact that one of the purposes of the JJA is to hold juveniles accountable for criminal behavior does not

---

[15]RCW 13.40.010(2).

[16]RCW 13.40.010(2)(a)-(k).

[17]The emphasis on family involvement is found elsewhere in recent amendments. *See* RCW 5.60.060(2)(b) (attorney-client privilege protects parents from being compelled to disclose the juvenile's communication with his or her attorney); RCW 13.40.130(2), (10) (parents must attend hearings and may be held in contempt for failing to attend).

[18]The purposes of the SRA are to:

erase the differences between the adult and juvenile systems. As the court observed in *Schaaf,* it is the nature of the penalty, not the criminal act committed, that distinguishes the juvenile from the adult system.[19]

B. "Conviction" of Juveniles

 Significant to the *Schaaf* court's analysis was the fact that under the juvenile code, an adjudication does not constitute conviction of a crime. RCW 13.04.240 provides: "An order of court adjudging a child delinquent or dependent under the provisions of [RCW 13.04] shall in no case be deemed a conviction of crime." Thus, "an act which would be a crime if committed by an adult is not a crime, and thus not a felony, if committed by a juvenile."[20]

RCW 13.04.240 was not changed by the 1997 amendments. But Appellants argue it was repealed by implication, because the 1997 amendments added a separate provision to the juvenile code, which gives the term "adjudication" the same meaning as the term "conviction" under the SRA.[21] Under the SRA, the term "conviction" now includes an adjudication of guilt under Title 13 RCW.[22] Appellants argue that the amendment reveals a legislative

---

(1) Ensure that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history;

(2) Promote respect for the law by providing punishment which is just;

(3) Be commensurate with the punishment imposed on others committing similar offenses;

(4) Protect the public;

(5) Offer the offender an opportunity to improve him or herself; and

(6) Make frugal use of the state's resources.

RCW 9.94A.010.

[19]*Schaaf,* 109 Wn.2d at 7-8 (citing *State v. Bird,* 95 Wn.2d 83, 91, 622 P.2d 1262 (1980) (Dolliver, J., dissenting)).

[20]*In re Weaver,* 84 Wn. App. 290, 294, 929 P.2d 445 (1996); *see also State v. Cheatham,* 80 Wn. App. 269, 273, 908 P.2d 381 (1996) (noting that juvenile cannot be convicted of a crime or a felony).

[21]RCW 13.04.011(1).

[22]RCW 9.94A.030(9).

intent to "dismantle all significant distinction between adult and juvenile court," principally because juvenile adjudications are now considered as criminal history in sentencing adult offenders.

The amendments seem to have imparted some confusion as to terminology. But we find the issue not pertinent to the question before us. The fact that a juvenile adjudication will be considered as criminal history in a later adult prosecution is not new,[23] and does not determine whether the juvenile proceeding itself so resembles an adult proceeding as to require a jury trial. Nor was terminology (i.e., conviction versus adjudication) the focus of the *Schaaf* court's emphasis. The court specifically enumerated several differences in consequences, such as availability of diversion and different detention facilities for juveniles.[24] If these differences remain, it does not matter if the differences in terminology do not. Rather, the question is whether the purposes, procedures, and penalties for juvenile proceedings have become so similar to those for adults as to eliminate the distinctions that have led courts to conclude the right to a jury trial does not extend to juveniles.

## C. Other Amendments

Appellants contend that certain other specific 1997 amendments, taken together, compel the conclusion that the differences are indeed overwhelmed by the similarities. These cited changes fall into three general categories: privacy of records, public stigma, and severity of penalty.

### 1. Records

Before the 1997 amendments, a juvenile could have his or her record sealed after two years, and destroyed when the juvenile reached 23 years of age.[25] Also, a person 18 years of age or older whose criminal history consists of only one referral for diversion could have his or her record

---

[23]*See State v. Randle*, 47 Wn. App. 232, 734 P.2d 51 (1987).

[24]*Schaaf*, 109 Wn.2d at 8.

[25]Former RCW 13.50.050(11)(a), (17).

destroyed if two years had elapsed since completion of the diversion agreement.[26] Under the amended provisions, records of class C offenses other than sex offenses may be sealed only after 5 years, records of class B offenses other than sex offenses may be sealed only after 10 years,[27] and records of class A offenses and sex offenses may never be sealed.[28]

The statutes allow for the destruction of records only if the juvenile's criminal history consists of only one referral for diversion.[29] A juvenile justice or care agency may, however, routinely destroy records when the subject of the records reaches the age of 23, although the court may not routinely destroy the official juvenile court file or records or transcripts of any proceedings.[30]

Although the standards for sealing juvenile records have changed, the amendments have not eliminated the differences between the two systems. While sealing and destruction of a juvenile offender's records are now more restricted, the possibility remains in many circumstances, while the possibility of vacation of an adult offender's record of conviction is much more narrowly circumscribed.[31]

## 2. Stigma

Appellants argue that such stigma now attaches to a juvenile adjudication that a jury trial is required. They point to RCW 9.41.040, defining the crime of unlawful possession of a firearm by a felon, under which a "conviction" is

---

[26]RCW 13.50.050(18).

[27]RCW 13.50.050(11)(a).

[28]RCW 13.50.050(11)(d).

[29]RCW 13.50.050(16).

[30]RCW 13.50.050(21).

[31]For example, an adult offender may not have his or her record of conviction cleared if: (1) there are criminal charges against the offender pending in a court of this or any other state, or a federal court; (2) the offense was a violent offense; (3) the offense was a crime against persons; (4) the offender was convicted of another offense since discharge from prison; (5) the offense was a class B felony and less than 10 years have passed since discharge; or (6) the offense was a class C felony and less than 5 years have passed since discharge. RCW 9.94A.230(2).

defined to include a juvenile adjudication of guilt.[32] They recount a number of ways in which juvenile adjudications may have collateral consequences and assert that, under the statutes currently in effect, DNA samples may be taken from juveniles, juvenile adjudications may be disseminated, a juvenile adjudication may prevent a person from serving on a jury, and juveniles who commit alcohol and drug offenses lose their driver's licenses for a specified period and are ineligible for public assistance and food stamps. Because of these factors, they claim the stigma that attaches to a juvenile adjudication is equal to the stigma that attaches to a conviction in adult court.

The fact that the 1997 amendments may have increased the stigma of a juvenile adjudication does not by itself compel the conclusion that the juvenile system is no longer more rehabilitative in its treatment of offenders or more responsive to the needs of offenders than the adult criminal system. We thus turn to a review of the effect of the amendments on the critical penalty aspect.

3. <u>Punishment</u>

a. Possible future consequences. Appellants first focus on the increased severity of possible future consequences regarding adult punishment. They argue that the way in which juvenile adjudications are now counted as prior offenses under the SRA in computing an adult's sentence shows the similarity between the adult and juvenile systems. But as we have discussed above, the consideration of prior juvenile adjudications when sentencing an adult is nothing new. Even before enactment of the SRA, it was permissible to consider prior juvenile offenses at a subsequent adult sentencing. "The mere fact that such use is now mandatory in certain circumstances does not constitute any additional punishment for the prior behavior or

---

[32]RCW 9.41.040(3); *see also State v. McKinley*, 84 Wn. App. 677, 929 P.2d 1145 (1997).

attach any additional 'stigma' to the juvenile offenses."[33] Changes in the way juvenile offenses are treated as prior offenses under the SRA do not affect the punishment imposed upon the juvenile for the juvenile offense, and so do not support a conclusion that juveniles are entitled to jury trials.

In a related argument, Appellants identify, as perhaps the "most ominous implication" of recent changes, the possibility that juvenile adjudications may be counted as "strikes" under the persistent offender statute, RCW 9.94A.030(27). We first note that a juvenile cannot be classified as a persistent offender. A "persistent offender" is defined as "an *offender* who: . . . [h]as . . . been convicted *as an offender* on at least two separate occasions."[34] The SRA defines "offender" as:

> a person who has committed a felony established by state law and is eighteen years of age or older or is less than eighteen years of age but whose case is under superior court jurisdiction under RCW 13.04.030 or has been transferred by the appropriate juvenile court to a criminal court pursuant to RCW 13.40.110.[35]

Under this definition, a juvenile who is tried as a juvenile and not as an adult is not included in the definition of offender under the SRA, and therefore a juvenile offender is never eligible to be treated as a persistent offender, and juvenile adjudications do not qualify as "strikes."

Similarly, Appellants also claim that juvenile adjudications will affect eligibility under the SRA for the drug offender sentencing option and work ethic camp. But the same definition of "offender" applicable to the persistent offender statute also applies to the SRA provisions

---

[33]*State v. Randle*, 47 Wn. App. 232, 242, 734 P.2d 51 (1987).

[34]RCW 9.94A.030(27) (emphasis added).

[35]RCW 9.94A.030(25).

governing the drug offender sentencing option,[36] and to work ethic camp.[37] An adjudication in juvenile court does not make one an "offender" under these provisions, so again, we disagree with Appellants' interpretation of the statutes.

Next, Appellants point out that a juvenile felony record may render an adult ineligible for the first-time offender waiver under RCW 9.94A.120(5). The first-time offender waiver is available only to persons who have never previously been convicted of a felony in Washington.[38] Because "conviction" under the SRA includes adjudications of guilt under Title 13 RCW,[39] and "adjudication" under the juvenile code has the same meaning as conviction,[40] it is arguable that juveniles who have been adjudicated guilty of felonies are ineligible for a first-time offender waiver for their first adult offense. Once again, however, in determining whether juveniles are entitled to a jury trial, the focus is on the punishment and procedures in the juvenile system as compared to the adult criminal system. That a juvenile felony record may deny an adult a first-time offender waiver has no bearing on whether juveniles are treated differently than adults at the time of the juvenile offense.

In sum, the increased severity of the future consequences of a juvenile adjudication brought about by the 1997 amendments to the juvenile justice code does not constitute additional punishment of the juvenile[41] and does not compel the conclusion that juveniles are constitutionally entitled to a jury trial.

b. Immediate consequences. Appellants also point to other changes, however, which do affect the juveniles at the time of the juvenile adjudication: revision of the Option B

---

[36]RCW 9.94A.120(6)(a)(ii).

[37]RCW 9.94A.137(1)(a)(ii).

[38]RCW 9.94A.030(22).

[39]RCW 9.94A.030(9).

[40]RCW 13.04.011(1).

[41]*Randle*, 47 Wn. App. at 241.

sentencing option, the elimination of minor, middle, and serious offender designations, and the slight lengthening of the minimum period of Division of Juvenile Rehabilitation (DJR) commitment. Appellants assert that these changes significantly diminish the discretion of juvenile court judges to determine whether DJR commitment, as opposed to community supervision, is appropriate, and thus lessen the degree to which the juvenile court can tailor individualized treatment to the needs of the particular offender.

We disagree with Appellants' view of the effect of these changes. While Appellants are correct that the changes may lessen the scope of discretion available to the juvenile court in fashioning a rehabilitative disposition for the most serious offenders, the juvenile court's discretion for other offenders is enhanced under the amendments. A clearer emphasis is placed on "local sanctions"; the juvenile court retains discretion to determine whether treatment within the community is a more appropriate disposition than incarceration,[42] and to order community supervision, which may include individualized programs involving employment, education, or treatment.[43] Community-based rehabilitation, which may be included in an order of community supervision and which may consist of educational, treatment, and outpatient mental health programs, was expanded by the amendments to include employment and literacy programs.[44] If the court concludes that a disposition within the standard range would effectuate a manifest injustice, the court may impose a disposition outside the standard range, which shall be comprised of confinement, community supervision, or a combination of both.[45] Further, juveniles retain the opportunity to avoid adjudication altogether through diversion agreements and deferred dispositions,[46] which focus on rehabilitation and are either

---

[42]RCW 13.40.0357 (Option A).

[43]RCW 13.40.020(4).

[44]RCW 13.40.020(1).

[45]RCW 13.40.160(2).

[46]See RCW 13.40.070, .080.

not available in the adult criminal system or are available only in a very limited context (deferred sentences).[47] The juvenile court thus retains discretion to tailor the disposition to meet the needs of the juvenile and the rehabilitative and accountability goals of the juvenile code.

In contrast, the adult sentencing court ordinarily has no discretion to order an adult felon to participate in employment or educational programs,[48] and may order a defendant to participate in outpatient mental health treatment only if a presentence report provides reasonable grounds to believe that the defendant is a mentally ill person as defined in RCW 71.24.025 and that this condition was likely to have influenced the offense.[49] The adult sentencing court has discretion to order rehabilitation only where an offender meets the requirements for a first offender waiver,[50] a drug offender sentencing alternative,[51] or a sex offender alternative.[52] The adult equivalent of a juvenile manifest injustice sentence, an exceptional sentence, may include rehabilitative measures only if the reasons for doing so are substantial and compelling.[53] The adult sentencing court thus has very little discretion to order rehabilitative measures.

Appellants urge that changes to the restitution provisions of the juvenile code illustrate the legislature's decision to make the juvenile code more of a "just deserts"

---

[47]*See e.g.*, RCW 9.94A.130 (abolishing the power to defer or suspend the imposition or execution of a sentence for felonies committed after June 30, 1984, except for offenders sentenced under the special sex offender sentencing alternative); RCW 10.05 (allowing, under specified circumstances, a person charged with a misdemeanor or gross misdemeanor to petition a court of limited jurisdiction to be considered for a deferred prosecution program).

[48]RCW 9.94A.030(11).

[49]RCW 9.94A.120(20).

[50]RCW 9.94A.120(5).

[51]RCW 9.94A.120(6).

[52]RCW 9.94A.120(8).

[53]*State v. Estrella*, 115 Wn.2d 350, 358, 798 P.2d 289 (1990).

code, and thus more like the adult criminal code. But juvenile restitution is remedial, not punitive,[54] and thus does not advance Appellants' arguments here.

■ Appellants also point to the community notification provisions now applicable to juveniles found to have committed a violent offense, a sex offense, or stalking.[55] The adult sex offender registration statute does not constitute punishment, but rather is a regulatory measure.[56] It follows that community notification requirements for juvenile offenders are likewise not punitive, and do not affect a juvenile offender's right to a jury trial.

We thus identify numerous provisions in the juvenile code remaining after the 1997 amendments that preserve the critical differences between the adult and juvenile systems. The juvenile code also provides for much more lenient penalties,[57] a difference that weighs heavily in the balance between the two systems for purposes of a juvenile's right to a jury trial.[58]

A telling illustration of the fact that juvenile proceedings remain more lenient and more rehabilitative than adult criminal proceedings is the fact that none of the juveniles involved in this appeal availed themselves of the opportunity, pursuant to RCW 13.40.110, to request the juve-

---

[54]*State v. Hartke*, 89 Wn. App. 143, 147, 948 P.2d 402 (1997).

[55]RCW 13.40.215.

[56]*State v. Ward*, 123 Wn.2d 488, 510, 869 P.2d 1062 (1994).

[57]As the State points out, E.S. was committed to the Division of Juvenile Rehabilitation for 5 to 7 months for the commission of the offense of indecent liberties, while an adult convicted of the same offense would face a standard range of 57 to 75 months. T.M. was convicted of possession of cocaine with intent to deliver and faced a commitment of 19 to 23 months. Had he been convicted of this offense as an adult, his standard range, considering his history of three prior felony offenses, would have been 154 to 254 months. R.G. was ordered to serve two days of confinement for residential burglary; as an adult, he would have faced a standard range of three to nine months. J.H. was found guilty of making threats to bomb or injure property and was ordered to serve five days of confinement. An adult convicted of the same crime would face a standard range of three to nine months.

[58]*State v. Schaaf*, 109 Wn.2d 1, 7-8, 743 P.2d 240 (1987).

nile court to decline jurisdiction and transfer the matter to the adult criminal system, where a jury trial would have been available. In fact, one appellant expressly opposed declination of juvenile court jurisdiction, pointing to the fact that his lack of sophistication and maturity were the bases for the probation department's recommendation that he be retained in the juvenile system rather than be transferred to the adult criminal system. Notably, he argued that because he is an emotionally immature teenager, he would greatly benefit from the counseling available in the juvenile justice system:

> While in the juvenile detention system, [the juvenile] would be eligible to receive both counseling and assistance from a number of programs only available through the JRA. In the event [he] was convicted and sentenced as an adult, he would simply serve out his sentence and receive nothing in the way of rehabilitative programs.

The penalties and procedures under the juvenile system thus remain significantly different from those under the adult criminal system after the 1997 amendments. While those amendments somewhat increased its punishment aspect, they also increased its rehabilitative scope. The juvenile system continues to focus to a greater degree on the needs of the offender and on the goal of rehabilitation, rather than on punishment, which is the primary focus of the adult system. The continued existence of these differences compels us to conclude that the right to a jury trial does not apply to juvenile proceedings.

It is noteworthy that the amendments to the juvenile justice provisions considered in *Schaaf* went farther towards making the juvenile system more of a "just deserts" system, similar to the adult system, than do the 1997 amendments under scrutiny here. The *Schaaf* Court rejected the arguments that the amendments created a constitutional right to a jury trial in juvenile adjudications. We cannot say that the 1997 amendments change the results of the analysis. The *Schaaf* court's reasoning still applies:

In sum, while juvenile proceedings are similar to adult criminal prosecutions, enough distinctions still exist to justify denying juvenile offenders the right to a trial by jury. Juvenile offenders are afforded special protections under the present system, and we perceive no valid reason to jeopardize those protections by making juvenile proceedings fully akin to adult proceedings.[59]

## III. State Jury Trial Guarantee

The Washington constitution guarantees a jury trial in criminal prosecutions and also provides that the "right of trial by jury shall remain inviolate."[60] Appellants argue that even if they are not entitled to a jury trial under the federal constitution, they are so entitled under these provisions of the state constitution.

The court in *Schaaf* considered and rejected this argument. The court undertook a *Gunwall*[61] analysis to determine whether the protection afforded under the state constitution is broader than that afforded under the federal constitution. Of the six *Gunwall* factors,[62] the court relied most heavily on the state constitutional and common law history and the preexisting state law factors in reaching its conclusion that the state constitution did not mandate jury trials in juvenile proceedings.

With respect to the state constitutional and common law history factor, the juveniles in *Schaaf* argued that because article I, section 21 preserves the right to a jury trial as that right existed at common law in the territory when section 21 was adopted, they are entitled to a jury trial under the state constitution because they would have been

---

[59]*Id.* at 22.

[60]WASH. CONST. art. I, §§ 21, 22.

[61]*State v. Gunwall*, 106 Wn.2d 54, 61-62, 720 P.2d 808, 76 A.L.R.4TH 517 (1986).

[62](1) The textual language of the state constitution; (2) a comparison of the texts of parallel provisions of the state and federal constitutions; (3) state constitutional and common law history relating to the provisions at issue; (4) preexisting state law; (5) the structural difference between the federal and state constitutions; and (6) whether the matter is of state interest or local concern.

guaranteed a jury trial at the time the state was a territory. In rejecting this claim, the court stated that this argument

> overlooks the salient fact that territorial lawmakers did not anticipate the enactment of a separate juvenile justice system. Washington did not create a separate juvenile court system until 1905, and did not pass comprehensive legislation concerning the juvenile justice system until 1913. It does no violence to our state's common law history to give credence to a 70-year-old legal system that was nonexistent in our territorial days.[63]

The 1997 amendments do nothing to diminish the validity of the Supreme Court's reasoning.

With respect to the preexisting state law factor, the court noted that since the creation of the juvenile court system, "this state has been trying to avoid accusing and convicting juveniles of crimes."[64] The court recognized that since its creation, the juvenile justice system has placed increased emphasis on the juvenile's criminal activity. But, because the changes to the JJA did not create a rigidly punitive system that mirrored in every respect the adult criminal justice system, the court in *Schaaf* declined to "adopt a system where juveniles are treated like adult criminals."[65]

It is fair to say that the 1997 amendments increased the juvenile code's emphasis on accountability for serious criminal activity. The amendments also, however, enhanced the court's ability to address the needs of juvenile offenders. Emphasis is still placed on rehabilitation in the juvenile system, whereas the adult system focuses almost entirely on punishment. The court's statements in *Schaaf* still apply. Thus, even after the 1997 amendments to the juvenile justice provisions, the state constitution still does not guarantee to juveniles the right to trial by jury.

---

[63]*Schaaf*, 109 Wn.2d at 14 (footnote omitted).

[64]*Id.* at 15.

[65]*Id.*

## IV. Federal and State Equal Protection Guarantees

Appellants also argue that the denial of a jury trial embodied in RCW 13.04.021(2) violates both the federal and state equal protection guarantees. The first step in an equal protection analysis is to determine the proper test under which to analyze this claim. "Juveniles are neither a suspect class nor a semi-suspect class."[66] For the reasons expressed above, the jury trial guarantees in the constitutions do not apply to juveniles. Thus, as before the 1997 amendments, a jury trial is not a fundamental right from a juvenile's standpoint.[67] Accordingly, the juveniles' equal protection claim is properly analyzed under the rational relationship test.[68]

> "The rational relationship test is the most relaxed and tolerant form of judicial scrutiny under the equal protection clause. Under this test, the legislative classification will be upheld unless it rests on grounds wholly irrelevant to achievement of legitimate state objectives."[69]

The court in *Schaaf* applied the rational relationship test to RCW 13.04.021(2) and held that the statute did not violate the equal protection clause:

> We conclude that the Legislature's statutory denial of jury trials to juveniles is rationally related to its desire to preserve some of the unique aspects of the juvenile court system. Juveniles do have distinguishing characteristics—age and vulnerability—relevant to interests the state has authority to implement—rehabilitating and treating—and the unique features of the juvenile court system are rationally related to furthering those interests.[70]

The absence of a jury trial remains an important example of the unique rehabilitative nature of juvenile proceed-

[66]*In re Boot*, 130 Wn.2d 553, 572-73, 925 P.2d 964 (1996).

[67]*Schaaf*, 109 Wn.2d at 21.

[68]*Id.*

[69]*In re Boot*, 130 Wn.2d at 573 (quoting *State v. Shawn P.*, 122 Wn.2d 553, 561, 859 P.2d 1220 (1993)).

[70]*Schaaf*, 109 Wn.2d at 22.

ings.[71] Because the juvenile justice provisions as amended still retain significant differences from the adult criminal justice system and still afford juveniles special protections not offered to adults, then, under the rational relationship test, RCW 13.04.021(2) does not violate the equal protection guarantees of the state and federal constitutions. Neither the federal nor state constitution requires that a juvenile be accorded a jury trial. We therefore affirm.

The balance of this opinion has no precedential value and will not be published, but will be filed for public record pursuant to RCW 2.06.040.

KENNEDY, C.J., and AGID, J., concur.

Review denied at 139 Wn.2d 1014 (1999).